UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALERIESHA J. HOWARD
and RODNEY K. WALLACE,

        Plaintiffs,

v.

ELITE MARKETING GROUP
OF ATLANTA, INC.,

        Defendant.
_____/

Case No. 10-CV-15140

HON. GEORGE CARAM STEEH

OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

On December 28, 2010, plaintiffs filed this suit against their former employer, defendant Elite Marketing Group of Atlanta, Inc., alleging race discrimination relating to the termination of their employment. Plaintiffs bring claims pursuant to Title VII of the Civil Rights Act and Michigan's Elliott Larsen Civil Rights Act. Before the court is defendant's motion for summary judgment. The motion has been fully briefed and the court held oral argument. For the reasons that follow, the court DENIES defendant's motion for summary judgment.

BACKGROUND

Plaintiffs, Valeriesha Howard and Rodney Wallace, worked for Elite as table representatives marketing credit cards at the Detroit Metro airport. In this instance, Elite had a contract with Delta Airlines and American Express to promote a credit card. Elite has a kiosk table in the McNamara Terminal and solicits travelers to apply for the credit card.

Elite pays their table representatives based solely on the number of completed applications they solicit.  Table representatives are not paid for illegible applications, Canadian residents' applications, applications that contain inappropriate abbreviations, or applications that are missing information.  Elite prohibits table representatives from filling out a credit card application, changing credit card applications, or writing on the applications except to put their initials on top.  A representative is prohibited from filling out any part of a credit card application or changing a credit card application without the customer present.  Elite uses auditors (secret shoppers) to ensure its rules are followed.  Elite publishes a weekly bonus structure, where representatives are paid bonuses for exceeding individual and team targets.

After a customer applies for a credit card, that application is placed in a locked safe by the table representative.  The safe was available to all representatives using the same access code.  At the end of the shift, the applications are counted by the representative and the manager, Deborah Moroni.  The applications are overnighted by Moroni to Elite's office in New York where the processing department counts the applications, checks for completeness, reviews for fraud, and reports to accounting.  The applications are then sent to American Express.  Due to confidentiality concerns, Elite does not maintain copies of the applications.

Howard and Wallace were both hired based on referrals.  Howard was referred to Elite's program by Celeste Sears, an African American.  She was hired and began working in May 2009.  Wallace, Howard's boyfriend, was recruited by Elite based on Howard's referral to Moroni. He began working in June 2009.  Howard acknowledged that quite a few representatives were hired based on referrals and that using referrals was a pretty good

way of recruiting people for such positions. Howard referred two individuals, Wallace and Amber Cabral, and both were hired. Both individuals are African American.

At the request of plaintiffs, Moroni generally scheduled them to work the same shift. In the beginning, plaintiffs performed well. After a few weeks of work, plaintiffs became frustrated and disappointed with the bonus structures. Moroni believed she "couldn't do anything correctly without getting complaints." At the end of many shifts, Howard sent an email complaining. Moroni testified that Howard was causing negativity and "trying to recruit others to be on the band wagon of complaining."

On June 16, 2009, Howard sent an email complaining about the bonus structure. She said she "strongly believe[d]" that Elite "needs to adjust" the structure in certain situations, because "it is frustrating to go into work knowing" you likely will not meet the bonus targets.

On June 24, 2009, Howard complained about the bonus structure and incomplete applications. She states that it "seems as if Elite is finding ways to not pay [the representatives]." She complained that representatives were "baited and misled by the company" and "misinformed." As a result, "the representatives lack trust for Elite," which was "the environment that has been created by Elite." Howard threatened that Elite was going "to create a high turnover rate" and warned that "a lot of us are highly-educated...and do not have problems finding other employment." During her deposition, Howard acknowledged that this could be viewed as a threat to leave.

On June 24, 2009, Wallace complained about issues with incompletes. He stated "[i]ts [sic] only my forth [sic] week and I never imagined I would have so many problems with a company so soon."

At the end of June and beginning of July, Howard complained about the bonus structure and late changes to it.

On July 15, 2009, Howard sent an email stating "a lot of your representatives, myself included, are updating their resumes and looking for new opportunities." She complained about the bonus structure and said "this is no longer the job that we signed up for, and I can honestly say thay [sic] I would not have accepted the position if I was shown the current bonus structure."

Howard testified that she sent the emails because she wanted to resolve the issues and stay with the company. Plaintiffs raised questions in their emails with regard to the appropriate handling of applications, what would disqualify an application, and the bonus structure.

Edward Jones, a Caucasian representative, also complained to Moroni on a consistent basis. He was removed from the program on July 19, 2009 due to his negativity.

Around August 2009, Elite's processing department discovered several of plaintiffs' applications had the same handwriting. This was an indicator of possible fraud, as the representatives were prohibited from writing on the applications, and Moroni was notified. She discussed the matter with Wallace, who admitted writing on applications but claimed he was assisting passengers. Assisting a customer, if they requested help and were present, was an acceptable duty of a tabling representative. On August 14, 2009, the head of Elite's processing department emailed Moroni and told her to speak to Howard as well. At her deposition, Moroni did not recall if she spoke with Howard about these questionable applications. Moroni kept an eye on plaintiffs "but never noticed any further inappropriate handling of the applications."

On August 26, 2009, Wallace gave notice that he was ending his full-time engagement and wished to be scheduled only three days a week. On September 10, 2009, Howard gave notice that she was reducing her shifts to three days a week, stating that she was "no longer making the amount of money that I came in making" and "can no longer commit full time." On the same email chain, Moroni told Polit "[s]end me Blanca for a couple weeks and I can pull both the idiots." At the same time, two other representatives, Joshua Mull and Olivia Al-Sandouk, reduced their schedules from full-time, because of their school schedules.

On September 24, 2009, Moroni announced a new representative named Sakina Hill. Hill is African American. Wallace admits that he does not know if Hill picked up some of the shifts when his schedule was reduced. A few weeks later, Moroni announced four more new hires, all of whom are Caucasian. Howard admitted that she does not know if she was replaced by these four hires.

On September 21, 2009, Wallace sent Moroni an email indicating that he suspected a representative of switching applications by scratching out initials. Plaintiffs believe Gerard Cervenak was switching his incomplete applications with other representatives' complete applications. However, Howard admits she does not know for sure whether Cervenak actually did such acts. Wallace admits he never saw Cervenak switch out applications and that his allegations are "just a theory." Plaintiffs base their allegations on statements from other representatives who believed Cervenak was switching applications. The individuals referenced, Whitney Ruel and Timothy Banyai, submitted affidavits stating that they never suspected or accused Cervenak of switching applications. Banyai further attests that his cousin, Josh Mull, accused Cervenak of stealing his applications. Banyai

-5-

investigated the matter but found no markings, scribbles, or writing to show that Cervenak switched the applications. Banyai and Mull agreed that there was no proof against Cervenak and therefore dropped the matter. Moroni testified that she watched all individuals after receiving complaints from Wallace but did not find any applications with crossed out initials and no explanation attached.

On October 3, 2009, Moroni sent an email to her team of representatives correcting a schedule. She had mistakenly given four shifts per week to representatives who only wanted three shifts per week. In the email, she states "I didn't realize I had put reps that only want 3 shifts down for 4 and so had to go back to the drawing board. The bonus structure must be pretty good if reps only need 3 shifts per week! ;-)" On October 6, 2009, Moroni sent an email to her team reporting the results of the most recent audit and praising the work of Gerard Cervenak, Tim Banyai, and Bridgette Hawkin for an excellent audit. Hawkin is African American. Moroni attests congratulating representatives in front of the entire team for a job well done was something she did on a regular basis to encourage, support, and motivate the team.

On October 6, 2009, Wallace sent an email stating Moroni's email was a "slap in the face" and that he does not understand how someone who steals applications is praised while he is ridiculed for working three shifts per week. The same morning, Moroni replied "I believe he is not the only person to have done wrong and gotten another chance." Wallace believes this statement is an admission that Cervenak was stealing applications.

The same day, Howard sent an email to Moroni's supervisors, David Polit and Gregg Whiton. She states Moroni's email is "insulting" because it praises a representative who steals applications. She also states that she finds it necessary to explain why she has

reduced her schedule in light of "[a]n unprofessional email referencing the representatives who only want to work 3 days" a week. She explains that she has reduced her schedule because she "cannot commit full time to a program that promises me one thing and then delivers another."

On October 10, 2009, Moroni sent an email to Polit and Whiton stating that per their instruction she is removing Wallace and Howard from the schedule permanently. She indicates that she has not done the schedule for the next week as she is waiting for confirmation that the four new representatives went to the office.

On October 12, 2009, an auditor approached Howard and filled out a personal credit card application. Howard asked the auditor if she would fill out a second business application, telling her to just put her name and social security number on the application. Defendant asserts Howard's actions are a violation of defendant's policies as they can only mean that Howard would be writing on the application herself to complete it. In her deposition, Howard admitted that completing an application without the customer present is a violation of company policy. Defendant argues this audit simply confirmed its suspicions that Howard and Wallace were writing on customer applications.

In an October 14, 2009 email, Moroni states the October 19, 2009 schedule is a bit discombobulated because "we have four new reps starting on this schedule." When discussing the email and attached schedule in her deposition, Moroni testified she reduced plaintiffs' shifts as she was "eager to get them off the schedule." In response to the question "[s]o you are replacing them now?", she testified "I now have new recruits to fill the shifts." At the same time these individuals started, plaintiffs' shifts were reduced from

three per week to two per week, then to one per week. All four of the new representatives referenced are Caucasian.

On October 29, 2009, Moroni sent emails to Howard and Wallace indicating that their employment with defendant was being terminated due to audit results.

Moroni testified that she did not want to meet with plaintiffs after they were terminated because she "wasn't comfortable being alone with them" after the onslaught of emails and the attitude she received from them. Plaintiffs claim she had racial animus toward them because she was not concerned about meeting with Edward Jones, a Caucasian, post-termination. Moroni testified that Jones just showed up at the airport to return his badge, uninvited, and all of the representatives were there with her. When asked if she was "concerned about meeting him after he had been let go" before he just showed up, she replied "[n]ot necessarily, no."

On September 1, 2009, when plaintiffs were working full-time for defendant, 32% of the representatives at DTW were African American. As of September 2011, 36% of the representatives were African American.

STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment forthwith if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient

administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. Id.

ANALYSIS

To sustain a claim of race discrimination, a plaintiff must present direct evidence of race discrimination or establish a *prima facie* case under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 791 (1973). Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003). The parties in this case do not argue direct evidence of race discrimination exists. Without direct evidence, a plaintiff must set forth a *prima facie* case of race discrimination. Plaintiffs must show: (1) they were members of a protected class; (2) they were qualified for the positions; (3) they suffered adverse employment actions; and (4) they were treated differently than similarly-situated non-minority employees for the same or similar conduct or were replaced by individuals outside the protected class. Mitchell v. Toledo Hospital, 964 F.2d 577, 582 (6th Cir. 1992). If plaintiffs establish a *prima facie* case, then the burden of proof shifts to defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action. Johnson v. University of Cincinatti, 215 F.3d 561, 573 (6th Cir. 2000). If defendant satisfies its burden, plaintiffs must then prove that the proffered reasons for defendant's actions are a mere pretext for discrimination. Id.

In its motion for summary judgment, defendant argues plaintiffs failed to demonstrate the fourth element of their *prima facie* case. Defendant argues plaintiffs cannot show that they were replaced by individuals outside the protected class because defendant engages in frequent hiring and there is high turnover in the business.

Plaintiffs assert they were replaced by individuals outside of their protected class. Moroni testified that she made the decision to terminate plaintiffs but did not act on it immediately because of staffing issues. In an October 14, 2009 email, Moroni states the

October 19, 2009 schedule is a bit discombobulated because "we have four new reps starting on this schedule." When discussing the email and attached schedule in her deposition, Moroni testified she reduced plaintiffs' shifts as she was "eager to get them off the schedule." In response to the question "[s]o you are replacing them now?", she testified "I now have new recruits to fill the shifts." At the same time these individuals started, plaintiffs' shifts were reduced from three per week to two per week, then to one per week. All four of the new representatives referenced are Caucasian.

Defendant argues Sakinah Hill, an African American, was hired in the fall of 2009 and took over some of the hours worked by plaintiffs. After Howard, Wallace, and two other representatives requested that their hours be reduced to part-time, Moroni announced Hill and then weeks later the four more new hires referenced above. Wallace admits that he does not know if Hill picked up some of the shifts when his schedule was reduced. Howard admitted that she does not know if she was replaced by the four latter hires.

As plaintiffs have shown that Moroni decided to terminate plaintiffs and then began the process of removing plaintiffs from the schedule at the same time the four Caucasian representatives were placed on the schedule, plaintiffs have carried their burden, at this stage of the litigation, of showing they were replaced by individuals outside of their protected class.[1] Plaintiffs have therefore set forth a *prima facie* case of discrimination.

To show pretext for discrimination, plaintiffs must demonstrate by a preponderance of the evidence: (1) that the proffered reasons for their separations had no basis in fact; (2)

---

[1]The court need not address plaintiffs' alternative argument, that plaintiffs were treated differently from similarly situated employees outside their protected class.

that the reasons did not actually motivate the adverse action; or (3) that the reasons were insufficient to motivate the action. Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir. 1994). Defendant argues plaintiffs' employment was terminated because of a concern that plaintiffs' constant complaining and negativity would infect the team of representatives. Defendant also argues plaintiffs were treated the same as Eddie Jones. In addition, defendant argues suspicions about the propriety of applications taken by plaintiffs were confirmed in the Howard secret shopper audit. Plaintiffs argue they have evidence to raise a question of fact that defendant's proffered reasons are pretext for discrimination.

Plaintiffs argue the reasons for their termination changed over time, which suggests that the reasons are pretext. See Asmo v. Keane, Inc., 471 F.3d 588, 596 (6th Cir. 2006) (finding inconsistency between what employer told plaintiff and what it asserted in lawsuits as its reasons for terminating plaintiff's employment "is suspicious and evidence of pretext"); Eades v. Brookdale Senior Living, Inc., 401 Fed. Appx. 8, 12-13 (6th Cir. 2010) (finding "many changes in its explanation for [plaintiff's] termination may or may not lead to an ultimate conclusion that it retaliated against [plaintiff] for engaged in a protected activity, but certainly they show a genuine issue of material fact that should preclude summary judgment.")

In October 2009, plaintiffs were informed by Moroni that their termination was due to audit results. In March and April 2010, in relation to the EEOC investigation, defendant states customer credit card applications submitted by plaintiffs were found to have multiple handwritings which indicates someone other than the customer wrote on the application. Defendant also cites Howard's negative audit results. During her deposition in this case,

Moroni testified that she had already decided to remove plaintiffs from the program when the audit results came in, based on their negative behavior, and that she did not provide these reasons in her termination emails because she did not feel she owed them a detailed explanation. Defendant claims the negative behavior reason for termination is alluded to in its EEOC response. Defendant cites the EEOC response's statement that plaintiffs "did not demonstrate the necessary respect, did not display the care or concern for [defendant], our client, or the program and displayed a clear lack of judgment with regard to adherence to federal regulations." In spite of this reference by defendant in the EEOC response, plaintiffs argue that it was not until the defense of this lawsuit that defendant added the negativity, complaining, and confrontational attitude justification for plaintiffs' termination. Plaintiffs therefore argue the changes in defendant's justification of plaintiffs' termination is evidence of pretext sufficient to prevent summary judgment.

Moreover, plaintiffs argue that the "audit results" reason for termination has no basis in fact and did not motivate defendant's conduct. As to the audit of Wallace, Moroni admitted in her deposition that there was nothing in the audit report to justify terminating Wallace's employment. As to the audit of Howard, Howard merely told the auditor to write her name and social security number on the application and they would match up the application to her personal credit card application. Plaintiffs note that there is no evidence that Howard actually wrote on the second application or stated that she would fill out the application. However, defendant asserts Howard's actions suggest that Howard would be writing on the application herself to complete it. Moreover, defendant's processing department had already flagged several of Howard and Wallace's credit card applications because they had the same handwriting, an indicator of possible fraud. In her deposition,

Howard admitted that completing an application without the customer present is a violation of company policy. Plaintiffs also question the audit reason for termination because they claim they would have been fired immediately. They note that while defendant's processing department voiced concerns of wrongdoing in August, Moroni "never noticed any further inappropriate handling of the applications" and plaintiffs were not terminated until October.

Plaintiffs argue defendant's reference to plaintiffs' part-time schedule demands as part of the reason plaintiffs were terminated is not credible. Plaintiffs allege two other non-African-American employees, Josh Mull and Olivia Al-Sandouk, were allowed to reduce their schedule to three shifts per week. However, Moroni testified that it was not just the part-time request but rather Wallace's specific demands for working mornings or afternoons and not being able to work particular days. She also testified that the schedule would cause complaining and an overall bad attitude.

Plaintiffs argue that Moroni's statement that plaintiffs were negative, threatening, and confrontational is a subjective belief that cannot be verified by objective evidence. However, Howard testified that she voiced her concerns and she knows Wallace voiced his concerns. Plaintiffs argue they were merely seeking to have legitimate work questions answered and concerns resolved. Howard also testified that she, Wallace, and Jones had some issues with defendant. Moroni terminated the employment of Jones, a Caucasian representative, for engaged in such complaining. Moroni attests Jones was removed from the program "due to his constant complaining and negativity." Howard acknowledged Jones was removed from the schedule.

Plaintiffs argue Moroni's characterization of plaintiffs as confrontational is motivated by racial animus. In support of their claim of racial animus, plaintiffs cite Moroni's

statement that she was a little worried about having to meet plaintiffs together upon their termination. Moroni testified that she was uncomfortable meeting with them because it was clear that they were working together and their emails had become threatening. Because Moroni admitted that she was never threatened with physical harm, plaintiffs are not large individuals, and she was not worried about meeting with Jones upon his termination, plaintiffs argue Moroni's characterization of them as confrontational is based on their race. However, when asked why she was not concerned about meeting up with Jones, another terminated employee, Moroni testified that Jones just showed up at the airport to return his badge, uninvited, and all of the representatives were there with her.

Wallace testified that while he was working for defendant, it never crossed his mind that Moroni might be racist and that she never said anything racially inappropriate. Howard testified that no one said anything racially inappropriate to her and that she does not know if Moroni is a racist. She also testified that Moroni gave Celeste Sears, an African American, a second chance.

As to alleged threats to leave, plaintiffs argue they never made any explicit threats and any comments perceived as threats were complaints made to raise issues to be corrected. However, in her deposition, Howard acknowledged that she could see how a statement in her email could be interpreted as a threat to leave. Indeed, that is the most likely interpretation, but one this court cannot make if the evidence is properly viewed.

Thus, viewing the evidence as a whole and in the light most favorable to plaintiffs, plaintiffs have submitted sufficient evidence to create a genuine issue of material fact as to whether defendant's proffered reasons for terminating plaintiffs are a mere pretext.

CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is DENIED.

Dated: September 24, 2012

                                            s/George Caram Steeh
                                            GEORGE CARAM STEEH
                                            UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on September 24, 2012, by electronic and/or ordinary mail.

s/Barbara Radke
Deputy Clerk